FILED
JAMES BONINI
CLERK
04 JUN -2 AM 9: 56

**NOT RECOMMENDED FOR PUBLICATION**

FILED
MAY 2 7 2004
LEONARD GREEN, Clerk

No. 02-3562

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

NOT RECOMMENDED FOR FULL-TEXT
PUBLICATION

Sixth Circuit Rule 28(g) limits citation to specific situations.
Please see Rule 28(g) before citing in a proceeding in a court
in the Sixth Circuit. If cited, a copy must be served on other
parties and the Court.
This notice is to be prominently displayed if this decision
is reproduced.

**CLIFFORD CALEB BENNETT,**

        **Plaintiff/Appellant,**

**v.**

**P/O SCHROEDER, Police Officer of
the City of Cincinnati, P/O JAMES DAVIS,
Police Officer of the City of Cincinnati,
P/O JOHN DOE, Police Officer of the
City of Cincinnati, and CITY OF CINCINNATI,**

        **Defendants/Appellees.**

_____/

On Appeal from the United
States District Court for the
Southern District of Ohio,
Western Division

**BEFORE: BOGGS, Chief Circuit Judge; RYAN, Circuit Judge; and ROSEN,
District Judge.**[*]

ROSEN, District Judge.

## I. INTRODUCTION

Plaintiff/Appellant Clifford Caleb Bennett appeals the district court's final

judgment denying his motion for partial summary judgment and granting the motion for

summary judgment filed by Defendants Donald Schroeder, James Davis, and the City of

Cincinnati in this civil rights action brought by Plaintiff pursuant to 42 U.S.C. § 1983.

_____

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern
District of Michigan, sitting by designation.

For the reasons stated below, we AFFIRM the district court's judgment.

## II. <u>PERTINENT FACTS AND PROCEDURAL HISTORY</u>

On November 17, 2000, Cincinnati, Ohio hosted an international conference of business leaders known as the TransAtlantic Business Dialogue ("TABD"). The purpose of this conference was to promote world trade. The conference attracted numerous protestors, some of whom had congregated in the Fountain Square area of the city, on or near Third Street. The Cincinnati police force was mobilized to maintain order during this conference. Their measures included police barriers, mounted police, helicopters, a SWAT team and police in riot gear.

In the early-afternoon of November 17, a group of protestors were blocking a building on Third Street. Captain Vince Dimasi of the Cincinnati Police Department gave an order to the mounted police to "get the horses to peel the protestors off the building [and] get them moving down the sidewalk in an easterly direction." [ *See* Schroeder Dep. p. 7 at J.A. p. 63.] Defendant Donald Schroeder was one of the mounted police officers involved in escorting the protestors away from the building.

Plaintiff Clifford Caleb Bennett was initially among the group congregated on Third Street but upon seeing the police officers approaching, he started to move away from the crowd. *Id.*, J.A. p.64. Upon observing him attempting to move away, Officer Schroeder directed Bennett to move along with the group, and Bennett initially obeyed Schroeder's order. However, shortly after rejoining the group, Plaintiff ducked out from

the crowd again. *Id.*, J.A. p. 65. Schroeder had to stop the crowd's movement to get Bennett back moving with the group. *Id.* Plaintiff again complied with the Officer's order to stay with the crowd, and the group was then again directed to proceed in an easterly direction away from the building they had been blocking. About 30 or 40 feet later, however, Plaintiff again broke away from the crowd, moving "kind of quickly" through pillars that were holding up a pedestrian bridge the crowd was passing beneath. *Id.*, J.A. pp. 65, 72.

Officer Schroeder stopped the crowd at this point and he pursued Bennett around the pillars while still on horseback. Plaintiff attempted to dodge Officer Schroeder, but eventually he was stopped and began to move back toward the rest of the group. At approximately this time, the horse Schroeder was riding lost its footing and fell, knocking both Officer Schroeder and Bennett to the ground. *Id*., J.A. pp. 66, 74[1] Apparently, the horse slipped due to the slippery tiled surface of the sidewalk near the pedestrian bridge. *Id.*, J.A. p. 66. Plaintiff Bennett at this time had his back to Officer Schroeder. *Id.* at p. 74. Likewise, the other police officers accompanying the group all had their backs to both Bennett and Schroeder.

Upon hearing the commotion of Schroeder's horse falling, officers escorting the crowd on foot turned, and witnessed only the tail end of the fall. In response to seeing

---

[1] Plaintiff alleges in his Complaint that he was knocked down when the horse lurched forward and bumped into him while it was falling. *See* First Amended Complaint, ¶ 15 at JA p. 9.

the downed police horse, these other officers arrested Bennett. *Id.* Officer Schroeder was not involved with the arrest as he was examining his horse at that time to see if it had been hurt by the fall. *Id.* It was only after Schroeder had determined his horse was not seriously injured and had remounted that he saw that Bennett was being taken away in handcuffs and remarked, "Good, he needs to go." *Id.* at p. 75. There is no evidence of record as to who it was that made the decision to arrest Plaintiff or which of the police officers detailed to the TABD protest actually placed Plaintiff under arrest. As recounted by Officer Schroeder in his deposition,

> Q:      . . . Sergeant Schroeder, whose decision was it to arrest Caleb Bennett?
>
> A [by Defendant Schroeder]: I don't know. I don't know who grabbed him. When I got back up, as I was getting on my horse or right after I sat on the horse, I saw that he had already been handcuffed.
>
> A:      By whom?
>
> Q:      I don't know who handcuffed him, but he was being led away by two officers, Moton and Doyle. . . .
>
> Q:      And are they equestrian officers?
>
> A:      . . . [T]hey were on foot, they were our ground support.
>
> Q:      Did you say anything to Mr. Moton or Mr. Doyle?
>
> A:      . . . When I saw that he was in handcuffs and walking away from me, I just said, "Good, he needs to go." That was it.
>
> Q:      Okay. And you don't know who actually charged Mr. Bennett?
>
> A:      [Witness shook his head in the negative.]

4

J.A. pp. 74-75.

After he was handcuffed, Bennett was taken to a police bus that was set up to transport arrestees to one central location where one or two officers charged and signed the arrest slips as reported by the arresting officer. The Arrest and Investigation Report filled out for Plaintiff Bennett's arrest stated:

> While attempting to move crowd during T.A.B.D. demonstration, the above arr'd [arrested] refused numerous police orders to remain behind barricade. As Sgt. Schroeder approached arr'd, on horse, the above arr'd grabbed neck of horse and pushed causing horse raise [sic] front legs knocking Sgt. Schroeder off horse.

J.A. p. 22.

Based upon the above grounds as stated in the Arrest and Investigation Report, Plaintiff was charged with Assaulting a Police Horse in violation of Ohio Revised Code § 2921.32.1. All parties agree that the Arrest and Investigation Report incorrectly stated the grounds for Plaintiff's arrest.

After Bennett was charged, he was taken to the Hamilton County Justice Center where he was placed under a $10,000/10% bond. Plaintiff was unable to post bond, and remained incarcerated for five days.

As he was not the officer that signed the police slip, Officer Schroeder was unaware of the charging allegations contained in the Arrest and Investigation Report. Schroeder thought that Bennett had been arrested for disorderly conduct for his actions on November 17 which impeded the movement of the crowd the police had been

5

guiding. J.A. p. 67.  Upon receiving a "notify" of the trial of the City's case against Bennett which provided Schroeder for the first time with notification of the "Assaulting a Police Horse" charge, Schroeder immediately contacted the City Prosecutor assigned to the case and informed her of the mistaken charge.  The prosecutor informed Officer Schroeder that it was too late to amend the charge, and that she intended to dismiss the case.  Accordingly, on January 23, 2001, the case against the Plaintiff was dismissed pursuant to the prosecutor's request.

On February 8, 2001, Plaintiff filed a Complaint pursuant to 42 U.S.C. § 1983 alleging violation of his Fourth and Fourteenth Amendment rights against Officer Schroeder, Police Officer James Davis, and a third unnamed "John Doe" Police Officer. Approximately six months later, Plaintiff sought leave to amend his complaint to add the City of Cincinnati as a party-defendant.[2]  Plaintiff's request was granted on November 27, 2001, and his First Amended Complaint was filed that same date.  Upon consent of the parties, the case was subsequently referred to a Magistrate Judge for final disposition.

### III.  THE DISTRICT COURT'S DECISION

After the close of discovery, on January 4, 2002, Plaintiff filed a Motion for Partial Summary Judgment on Liability.  Defendants Schroeder, Davis and the City of Cincinnati responded to Plaintiff's Motion and cross-moved for summary judgment in

---

[2]  Plaintiff never requested nor did he make any attempt to amend his complaint to identify the "John Doe" police officer listed as one of the individual defendants.

6

their own favor on February 21, 2002.

In his motion for summary judgment, Plaintiff Bennett argued that he was entitled to summary judgment because the Defendants lacked probable cause to arrest him for assaulting a police horse. Defendants responded that the officers who actually physically arrested Plaintiff had probable cause to arrest him for assaulting a police horse for the reason that they mistakenly, but reasonably, believed that Plaintiff had caused the horse to fall because the horse fell when Officer Schroeder was engaged in directing Plaintiff to stay with the crowd and the arresting officers only witnessed the end of the fall.

The individual Defendants further countered that they were entitled to summary judgment in their favor based on a qualified immunity defense. They argued that the defense was applicable because the arresting officers reasonably believed that Plaintiff caused the horse to fall and because Officer Schroeder promptly contacted the prosecutor once he was made aware that Plaintiff had been improperly charged. The City of Cincinnati contended that it was also entitled to summary judgment in its favor because Plaintiff failed to adduce any evidence that the City had a policy or custom designed to deprive Plaintiff of his civil rights.

On May 14, 2002, the Magistrate Judge entered an Order and Judgment denying Plaintiff's motion for summary judgment and granting Defendants' motion for summary judgment which dismissed Plaintiff's Complaint in its entirety.

In reaching his conclusion, the Magistrate Judge found that a determination of the

7

offense for which probable cause is to be assessed need not be limited to the offense indicated in the arrest report or statements made by the officer at the time of the arrest. Thus, although the Arrest Report charged Plaintiff with assaulting a police horse -- a charge which the Magistrate Judge found was not supported by probable cause -- because Officer Schroeder testified that he had thought that the basis for Plaintiff's arrest was disorderly conduct, and because the Magistrate Judge found that the facts and circumstances surrounding Bennett's arrest were sufficient to lead a reasonably prudent police officer to believe that Plaintiff had committed a disorderly conduct offense. the court determined that probable cause existed to arrest Plaintiff for this offense. Accordingly, the Magistrate Judge determined that Officer Schroeder could not be held liable for violating Plaintiff's constitutional rights.  The Magistrate Judge further determined that entry of summary judgment in favor of the other individual Defendants -- Officer James Davis and the unidentified "John Doe" officer -- was also appropriate because Plaintiff failed to allege any facts or adduce any evidence demonstrating their involvement in his arrest or prosecution.  With regard to the municipal defendant, the City of Cincinnati, because all of the individual police officers had been absolved of liability, the Magistrate Judge held that the City could not be held liable under Section 1983, either.[3]  Accordingly, the district court entered summary judgment in favor of the

---

[3] The district court also dismissed Plaintiff's one state law cause of action for malicious prosecution pursuant to 28 U.S.C. § 1367(c)(3), without prejudice.  The dismissal of this state law claim is not at issue in this appeal.

Defendants and dismissed Plaintiff's Complaint.  Plaintiff timely filed a Notice of

Appeal.

## IV.  DISCUSSION

A.    STANDARD OF REVIEW

This court reviews a district court's summary judgment decision *de novo,* using

the same standard as the district court.  *E.I. Du Pont de Nemours & Co. v. Okuley*, 344

F.3d 578, 584 (6th Cir. 2003); *see also Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 465

(6th Cir. 2002).  Summary judgment is proper if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  *See  E.I. Du Pont de Nemours & Co. v. Okuley, supra;*

*Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 871 (6th Cir. 1997), *cert. denied,*

522 U.S. 1110 (1998); Fed. R. Civ. P. 56(c).

In ruling on a district court's grant of summary judgment, an appellate court does

not have to rely on the same reasons that persuaded the lower court.  Rather the appellate

court can find an alternative basis for concluding that a party is entitled to summary

judgment and ignore any erroneous bases relied upon by the district court, provided the

opposing party has had an opportunity to respond to the new theory.  *Airline Prof'ls*

*Ass'n of Int'l. Bhd. of Teamsters, Local Union No. 1224, AFL-CIO v. Airborne, Inc.*, 332

F.3d 983, 986 (6th Cir. 2003); *Herm v. Stafford*, 663 F.2d 669, 684 (6th Cir.1981). An

appellant has had "an opportunity to respond" when he is given a chance to "argue [his position]" before this court. *Airline Prof'ls, supra*, 332 F.3d at 986 (quoting *Shah v. Gen. Elec. Co.*, 816 F.2d 264, 270 (6th Cir. 1987)).

B.    PLAINTIFF ADMITS HE HAS NO EVIDENCE OF POLICE OFFICER JAMES
      DAVIS'S INVOLVEMENT IN THE COMPLAINED OF ACTIONS

As an initial matter, we note that although Plaintiff has named Cincinnati Police Officer James Davis as one of the Defendants in his First Amended Complaint, there is no evidence of record indicating any involvement whatsoever on the part of Defendant Davis in the events surrounding Plaintiff Bennett's arrest. Furthermore, Plaintiff's counsel conceded at oral argument that he does not know what, if anything, Officer Davis did. There is no evidence that Officer Davis was present at the time Bennett was arrested, nor does his name appear anywhere on the Investigation and Arrest Report concerning this incident.

It is well-settled that to state a cognizable Section 1983 claim, the plaintiff must allege some personal involvement by the each of the named defendants. *See Salehphour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir.1998), *cert. denied*, 119 S.Ct. 1763 (1999); *Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir.1995) (personal involvement by the defendant is an essential element in a § 1983 cause of action asserting a constitutional deprivation). Having failed to establish that Officer Davis was personally involved in any of the actions complained of, Plaintiff has failed to state a legally cognizable Section 1983 claim against this Defendant upon which relief may be granted. Accordingly, the

10

district court's grant of summary judgment in favor of Defendant Davis was correct.

C.    THE DISTRICT COURT ALSO PROPERLY GRANTED SUMMARY
      JUDGMENT IN FAVOR OF DEFENDANT SCHROEDER

Similarly, Plaintiff has presented less than even a "scintilla of evidence" of Officer

Schroeder's involvement with Plaintiff's arrest.  No evidence of Officer Schroeder's

involvement appears in Plaintiff's Interrogatory Answers.  All that Plaintiff stated in his

sworn answer to Interrogatory No. 14 upon which he relies is that

> [T]he rear legs of the horse ridden by Defendant Schroeder had slipped out
> from under it [and] Officer Schroeder fell from the horse as it slipped and
> stumbled to regain its balance.  Plaintiff was at once arrested, handcuffed,
> and put into a waiting van. . . .

Nowhere in his interrogatory answers does Plaintiff state that Officer Schroeder

was the police officer who arrested him.

Officer Schroeder testified in his deposition that officers who were on foot in

front of Schroeder and Plaintiff Bennett saw the tail end of his horse's fall, and

mistakenly assumed that Plaintiff had assaulted or struck the horse, and thereby caused

the fall.  Officer Schroeder testified that it was apparently one of the officers on foot who

arrested Plaintiff.  He stated that he did not witness the actual arrest and handcuffing of

Plaintiff; he was occupied with examining his horse.  Upon getting back on his horse, he

observed Plaintiff in handcuffs being escorted away by Police Officers Moton and Doyle.

Schroeder remarked to the escorting officers, "Good, he should go." [J.A. 75.]  It is

undisputed that Schroeder did not accompany Plaintiff to the central booking site.

11

The officers who arrested Plaintiff and escorted him to the booking site apparently made the Investigation and Arrest Report. It is not known whether either of the two officers who escorted Plaintiff to the booking site actually filled out the Investigation and Arrest Report or whether they merely verbally reported the incidents surrounding Plaintiff's arrest to a booking officer who filled out the report. The copy of that Report that is in the record is unsigned.

Other than Schroeder's "Good, he should go" comment upon seeing Plaintiff handcuffed and being escorted away from the protest march scene, the only "evidence" of Schroeder's involvement in Plaintiff's arrest is the appearance of his name on the Investigation and Arrest Report along with "P.O. Doyle" in the space on the Report form marked "Arresting Officer(s)." [See J.A. 22.]

Given the undisputed testimony of Officer Schroeder that he had no personal involvement in the arrest of Plaintiff -- testimony which, in fact, Plaintiff himself relied upon both in support of his own motion for summary judgment and in support of his opposition to Defendants' motion -- we find Schroeder's comment and the placement by some unknown officer of Schroeder's name in the "arresting officer" space on the Investigation and Arrest Report insufficient to defeat summary judgment. *See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 106 S.Ct. 2505, 2512 (1986)) (respondent to a summary judgment motion must adduce more than a scintilla of evidence to overcome the motion).

Having failed to come forward with any substantive evidence to establish that Defendant Schroeder personally participated in the alleged deprivation of Plaintiff's constitutional rights, we find that Plaintiff has failed to establish an essential element of his Section 1983 claim. *See Copeland v. Machulis, supra* (personal involvement by the defendant is an essential element in a § 1983 cause of action asserting a constitutional deprivation). For this reason, we are persuaded that summary judgment was properly entered in favor of Officer Schroeder.

However, even if we were to find Plaintiff's evidence sufficient to demonstrate personal involvement by Officer Schroeder, we nonetheless are convinced that the district court committed no error in entering summary judgment in Defendant Schroeder's favor based on the doctrine of qualified immunity.

The Supreme Court recently outlined the test for granting a public official qualified immunity from suit in a Section 1983 action in *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001). *Saucier* instructs us to apply the following two-part test: First, we ask whether, "[T]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Second, we must determine whether the right violated was clearly established. *Id*. at 201. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id*. at 202.

There is no question that Bennett has a constitutional right under the Fourth

13

Amendment to not be arrested in the absence of probable cause. *Monroe v. Pape*, 81 S. Ct. 473 (1961). Thus, the only question is whether there was probable cause for Bennett's arrest.

To determine if probable cause existed, the arresting officer's subjective knowledge of the facts are the only facts to be considered, even if some of the officer's beliefs were in fact mistaken. *Klein v. Long*, 275 F.3d 544, 549-50 (6th Cir. 2001), *cert. denied*, 537 U.S. 819 (2002). These subjectively known circumstances are then evaluated from the perspective of a reasonable, competent officer. *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 3039-40 (rejecting any consideration of subjective intent for purposes of qualified immunity). If "a reasonable officer could have believed" that his conduct was lawful "in light of clearly established law and the information the . . . officer[] possessed," then qualified immunity should be granted to the police officer. *Id.* at 3040.

The Supreme Court has considered the probable cause issue in the context of granting qualified immunity to a police officer applying for an arrest warrant. There the Court stated that qualified immunity has a very broad reach — it "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986). The *Malley* Court went on to state that "[d]efendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant

14

should issue; but if officers of reasonable competence could disagree on this issue,

immunity should be recognized." *Id.*

The Sixth Circuit has also considered cases where police officers have claimed

qualified immunity from suit based on mistaken but reasonable belief. In *Pray v. City of*

*Sandusky*, 49 F.3d 1154 (6th Cir. 1995) a group of police officers mistakenly entered and

searched the lower unit of a two-unit duplex, when the search warrant should have been

issued for the upper unit. In the context of Fourth Amendment search and seizure we

stated:

> It seems to this court that, as a legal matter, any search or seizure that
> occurred while the officers were under the mistaken but reasonable belief
> that they were in fact executing the warrant at the correct residence would
> be protected by qualified immunity. Conversely, any search or seizure that
> took place after the officers knew or reasonably should have known that
> they were in the wrong residence would no longer be protected by qualified
> immunity.

49 F.3d at 1159. We see no reason why this reasoning should not apply with equal force

in the context of a mistaken charge and a claim of deprivation of Fourth Amendment

rights arising out of an arrest.

Applying this framework to Defendant Schroeder leads us to the conclusion that

he was properly granted qualified immunity even if he were to be found responsible,

contrary to our analysis above, for Bennett's arrest. In reaching this conclusion, we are

mindful of the Supreme Court's observation that "[t]he concern of the immunity inquiry

is to acknowledge that reasonable mistakes can be made as to the legal constraints on

particular police conduct." *Saucier*, 533 U.S. at 205.  Defendant Schroeder pursued the

Plaintiff three times while he was attempting to move the crowd along in an orderly

manner.  Based on Plaintiff's repeated actions, Officer Schroeder had sufficient reason to

believe that Plaintiff had violated Ohio's disorderly conduct statute, which provides:

> (A) No person shall recklessly cause inconvenience, annoyance, or alarm to
> another, by doing any of the following:
>
>                                   \*\*\*
>
> (4) Hindering or preventing the movement of persons on a public street, road,
> highway, or right-of-way, or to, from, within, or upon public or private property,
> so as to interfere with the rights of others, and by any act which serves no lawful
> and reasonable purpose of the offender . . . .

O.R.C. § 2917.11.

As Officer Schroeder testified in his deposition, he felt that Plaintiff was

"interfering with our lawful activity, which was moving that crowd along." [*See*

Schroeder Dep., p. 18, J.A. 71.]  Based on the facts known to Officer Schroeder at the

time of the arrest, his actions and the arrest itself were reasonable.  Furthermore, there is

no dispute in the record that as soon as Officer Schroeder became aware of the incorrect

charge he immediately contacted the prosecutors to notify them of the mistake that had

been made.  Therefore, Officer Schroeder was fully compliant with his legal

responsibility to immediately cease any wrongful conduct as soon as the mistake was

discovered.  *Pray*, 49 F.3d at 1159.

Furthermore, we have previously held that the fact that an officer made an

incorrect charge initially does not mandate a finding of no probable cause to present another charge growing out of the same incident. *See, e.g., Avery v. King*, 110 F.3d 12, 14 (6th Cir. 1997). All that we have required is that the alternative charge be "in some fashion related" to the offense charged to justify the officer's entitlement to qualified immunity. *Id.* Although in *Avery* we found that the district court properly concluded that the existence of probable cause for a related offense excused the lack of probable cause for the offense charged for purposes of qualified immunity because the alternative charge was a "lesser included offense" of the offense actually charged, we see no reason why such an "identity of the elements" relationship should be required here where the factual predicate for a disorderly conduct charge was specifically included in the "Facts of Arrest" section of the Arrest and Investigation Report: "While attempting to move crowd during TABD demonstration, the above arrested refused numerous police orders to remain behind barricade. . . ." [*See* J.A. 22.]

Furthermore, finding that the existence of probable cause for a disorderly conduct charge here does not amount to an "*ex post facto* extrapolation[] of all crimes that might have been charged on a given set of facts at the moment of arrest" as cautioned against by the court in *Richardson v. Bonds*, 860 F.2d 1427, 1431 (7th Cir. 1988). Here, the undisputed record evidence is that disorderly conduct was the crime with which Officer Schroeder had thought all along Plaintiff had been charged. It was only upon receiving the "Notify" of the trial that he was made aware that Plaintiff had been erroneously

17

charged with assaulting a police horse and, as indicated above, Schroeder acted immediately to rectify the situation. Under the circumstances presented in this case, we find that Officer Schroeder is entitled to qualified immunity.

For all of the foregoing reasons, we find that the district court properly entered summary judgment in favor of Defendant Schroeder.

D.    SUMMARY JUDGMENT WAS PROPERLY ENTERED IN FAVOR OF THE CITY OF CINCINNATI

The district court also properly granted summary judgment to the City of Cincinnati.

Section 1983 liability does not lie against a municipality solely because it employed a tortfeasor or based upon a theory of *respondeat superior* or vicarious liability. *Monell v. Dep't of Soc. Serv. of the City of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018 (1978). Rather, to state a claim against a municipality under § 1983 for monetary, declaratory, or injunctive relief, a plaintiff must show: 1) a deprivation of his constitutional or federal rights: 2) that occurred pursuant to a custom, usage, or official policy of the municipality. *Monell, supra*, 436 U.S. at 690-91. Regarding this latter requirement, § 1983 liability attaches to a municipality only when the execution of its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," inflicts the injury upon the plaintiff. *Id.*, at 694; *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197 (1989) (affirming that a municipality may be "liable under § 1983 only where the municipality

18

itself causes the constitutional violation at issue" in that its policies or customs are the

"moving force [behind] the constitutional violation") (internal quotation marks omitted);

*Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292 (1986) (reiterating that a

municipality is liable only for its own acts-acts that it "has officially sanctioned or

ordered"). The policy or custom must originate from the "official or officials responsible

for establishing final policy with respect to the subject matter in question." *Pembaur*, 475

U.S. at 483.

In his First Amended Complaint, Plaintiff alleges only the following with regard

to his claim against the City of Cincinnati:

> 9.     The City of Cincinnati adopted a policy during the TransAtlantic
>        Business Dialogue of arresting protestors without probable cause
>        and in the absence of any violation of law in order to discourage
>        protest activity, reduce the level of persons participating in protest
>        activity and to reduce the message and effect of the protest against
>        the TransAtlantic Business Dialogue.  Instances of this policy are
>        arresting and jailing protestors with no intention of prosecuting them
>        and then after their release from jail, abandoning the cases, charging
>        people with clearly inappropriate criminal violations in order to
>        justify an arrest and then not prosecuting. . . .

* * *

> 25.    The policy of the City of Cincinnati in arresting protestors
>        without probable cause and in the absence of any violation of
>        law violates the plaintiff's rights under the first and
>        fourteenth amendments to the United States Constitution.

[First Amended Compl., ¶¶ 9, 25, J.A. pp. 8, 10.]

While this allegation might have been sufficient to withstand a pre-discovery

motion to dismiss or motion for judgment on the pleadings, at the summary judgment stage after the close of discovery, Plaintiff can no longer simply rely on the allegations in his complaint; rather, he must "present affirmative evidence" supporting his allegations in order to withstand summary judgment. *Anderson v. Liberty Lobby, Inc.*, *supra*, 106 S.Ct. at 2512. Plaintiff has not met this burden. There is no evidence in the record which supports Plaintiff's Complaint allegations. In fact, if the record evidence supports the existence of a municipal policy at all, it is a policy that directly contradicts Plaintiff's allegations and undermines his claim.

Officer Schroeder was specifically asked at his deposition, "Were you given any special instructions on how to arrest people during these...demonstrations?" [*See* Schroeder Dep., p. 34, quoted in Defendants' Summary Judgment Brief at J.A. p. 44.][4] Officer Schroeder responded that the officers assigned to the demonstration were directed "to be as tolerant as possible, arrest as a last resort, type of thing. . . . I don't remember, it was something -- be very thick[-]skinned kind of feel to it and that type of thing." *Id.* Counsel followed up that answer by asking, "So, you're telling me that you were not encouraged to arrest people?", *id.*, to which Officer Schroeder responded, "No, no. We were not told to arrest people. We were just told you're probably going to get a

---

[4] The parties did not include page 34 of Officer Schroeder's deposition in the Joint Appendix. However, this page is quoted -- presumably verbatim, as the excerpts are in quotation marks -- in Defendants' summary judgment brief, which is included the Joint Appendix.

lot of verbal abuse, a lot of hands in your faces and bad language and to be thick[-]skinned." *Id.*

Clearly, based on the foregoing record evidence, Plaintiff has not established a policy or custom that was designed to deprive Plaintiff of any constitutionally protected right under *Monell*. The only policy or custom the record supports is a that during the TABD conference, the officers should be "thick-skinned" and arrest as a last resort. Therefore, we find that the City of Cincinnati was properly granted summary judgment in this case.

## CONCLUSION

For all of the foregoing reasons, the decision of the district court granting Defendants' Motion for Summary Judgment and denying Plaintiff's Motion for Partial Summary Judgment is AFFIRMED.

RYAN, Circuit Judge, concurring.          I concur in the judgment in this

case because I agree that Bennett failed to come forward with any substantive evidence

to establish that either Schroeder or Davis personally participated in the alleged

deprivation of the plaintiff's constitutional rights.  I concur fully with my colleague's

disposition of Bennett's claim against the City of Cincinnati.